## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DOUGLAS CASSARD #437528**                    **CIVIL ACTION**

**versus**                                      **NO. 05-0386**

**STATE OF LOUISIANA**                          **SECTION: "N" (1)**

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).[1]  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination.  According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Douglas Cassard, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On December 6, 2000, he was convicted of second degree murder in violation of La.Rev.Stat.Ann. § 14:30.1.[2]  On March 2, 2001, he was sentenced to a term of life imprisonment, without benefit of parole, probation, or suspension of sentence, with credit for time served.[3]  On February 26, 2002, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence.[4]  He then filed with the Louisiana Supreme Court an application for writs of certiorari, mandamus, and prohibition[5] which was denied on December 19, 2002.[6]

On December 15, 2003, petitioner filed with the state district court an application for post-conviction relief.[7]  That application was denied on March 10, 2004.[8]  He then filed with the Louisiana Fifth Circuit Court of Appeal an application for writs of certiorari, mandamus, and

---

[2] State Rec., Vol. VI of VII, transcript of December 6, 2000, p. 158; State Rec., Vol. I of VII, minute entry dated December 6, 2000; State Rec., Vol. I of VII, jury verdict form.

[3] State Rec., Vol. VI of VII, transcript of March 2, 2001, pp. 16-17; State Rec., Vol. I of VII, minute entry dated March 2, 2001.

[4] State v. Cassard, 811 So.2d 1071 (La. App. 5th Cir. 2001) (No. 01-KA-931); State Rec., Vol. I of VII.

[5] State Rec., Vol. VII of VII.

[6] State v. Cassard, 833 So.2d 327 (La. 2002) (No. 2002-K-0917); State Rec., Vol. I of VII.

[7] State Rec., Vol. II of VII.

[8] State Rec., Vol. II of VII, Order dated March 10, 2004.

prohibition[9] which was denied on May 25, 2004.[10]  He next filed with the Louisiana Supreme Court an application for writs of certiorari, mandamus, and prohibition[11] which was denied on November 8, 2004.[12]  Petitioner filed an application for rehearing[13] which was denied on February 4, 2005.[14]

On February 9, 2005, petitioner filed this federal application for *habeas corpus* relief.[15]  In support of his application, petitioner claims:

    1.      Petitioner received ineffective assistance of counsel; and

    2.      The trial court erred in admitting prejudicial evidence.

The state concedes that petitioner's federal application is timely filed and that he exhausted his state court remedies.[16]

<u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact,

---

[9]  State Rec., Vol. VII of VII.

[10]  <u>State v. Cassard</u>, No. 04-KH-514 (La. App. 5th Cir. May 25, 2004) (unpublished); State Rec., Vol. II of VII.

[11]  State Rec., Vol. VII of VII.

[12]  <u>State v. Cassard</u>, 885 So.2d 1121 (La. 2004) (No. 2004-KP-1554); State Rec., Vol. II of VII.

[13]  State Rec., Vol. VII of VII.

[14]  <u>State v. Cassard</u>, 893 So.2d 83 (La. 2005) (No. 2004-KP-1554); State Rec., Vol. VII of VII.

[15]  Rec. Doc. 1.

[16]  Rec. Doc. 3, pp. 3 and 10.

questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).   The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams[ v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also Hill, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

<u>Facts</u>

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts

of this case as follows:

The defendant in this case purchased illegal narcotics from the victim on more than one occasion. On the evening of January 6, 2000, the defendant received a call from the victim, who said he was in a bind and needed money. The defendant replied that all he could give him was money, approximately $1000.00, that he already owed him.

The victim called again later asking for the defendant's help and asking to see him. According to the defendant, during that telephone call, the victim indicated that if the defendant did not help him he would "kick his ass." The defendant then left his apartment with a man named David Ostendorf ("Ostendorf") to sell some cocaine to Ostendorf's friend so that the defendant could get the money to pay the victim. Later, they dropped off a triple beam balance scale used to measure drugs at the defendant's apartment.

Later that evening, the defendant and Ostendorf and two other men, Ricky LeBlanc ("LeBlanc") and Ellis Case ("Case"), went to meet Mark Huerta ("Huerta") at the Louisiana Pizza Kitchen between ten and eleven p.m., when Huerta was getting off of work. After LeBlanc, Case and Ostendorf snorted cocaine in the parking lot at the Pizza Kitchen, LeBlanc and Case left the Pizza Kitchen to get hamburgers at Burger King. The defendant and Ostendorf followed Huerta to his house so that he could change clothes. All five of the men planned to meet at Huerta's house to go out later that night.

While the defendant and Ostendorf were waiting for Huerta to change, Huerta came outside, got into the defendant's car, and told the defendant that his girlfriend, Sabrina Hopstetter, had just called for him. Huerta reported that Sabrina was very upset because the victim had recently called her house and threatened to come over to her house to beat her and the couple's baby. After the defendant spoke with Sabrina, he became very angry. When the defendant settled down, he asked Ostendorf to "back him up" if there was fight between him and the victim.

When LeBlanc and Case arrived at Huerta's house, the other three men were not there. When LeBlanc called Huerta's cell phone, the defendant answered and told LeBlanc to "hang tight" because the defendant, Huerta and Ostendorf had to "handle some business."

Because the defendant was very upset concerning the threats, he testified that he tried to avoid meeting with the victim that night. But later he agreed to meet the victim after the victim stated that if the defendant did not meet with him that night the victim would "kick his ass." The two men initially decided to meet at the Amoco station on Manhattan Boulevard and 8th Street. But after arriving at the Amoco station and discovering it was unsuitable for their meeting, the defendant and the victim agreed to meet at "J-Dog's" house, which was also the victim's residence at that time.

The defendant was the first to arrive at J-Dog's house. He parked his car in front of the house but kept the motor running. The victim arrived and pulled up beside the defendant's car so that the two cars were facing opposite directions with the driver's windows next to each other. The victim asked the defendant if he had the money, to which he responded that he did. The victim then began talking about "the Cubans" who had threatened him earlier in the day but the conversation was still casual.

During this conversation, the victim tried to sell the defendant more drugs because he needed more money but the defendant refused. The victim became more aggressive and insisted that the defendant buy the drugs or he would "whip his ass." The defendant stated that the victim told him, "If you don't help me, you can call your old lady and ask her what will happen. Wait til you hear what I told your old lady I was going to do."

At that point, the defendant freaked out, pointed a gun at the victim, and yelled, "Don't you ever threaten me or my f_____ family again. If you do, I'll shoot you in your face. You worried about the Cubans, you'd be worrying about me." Eyewitnesses both stated that the victim made a defensive motion backward when the defendant pointed the gun at him.

Both eyewitnesses also testified that the victim then leaned forward and said with a grin on his face, "you just put a gun in my face, I'm Allen f_____g Cooper." The defendant replied, "Yes, I did b_____!" and then shot the victim with at point blank range with a .38 caliber pistol.

At trial, the defendant testified that the victim leaned forward on his window and he thought the victim was coming toward him. Further, the defendant claimed that the victim had to have a gun on him and that one of his hands was out of sight. Finally, the defendant testified that he thought the victim had a gun to protect his drugs and money but he did not see a gun that night. He believed, however, that the victim was going for a gun and, therefore, he shot him.

At trial, Ostendorf corroborated the defendant's statement that the victim's right hand was out of sight during the argument but refuted the defendant's statement that the victim's movement toward the car window was intimidating.  Ostendorf also testified that the defendant told him that he had a gun with him because of the victim's reputation and that sometimes things get "shady."

After the shooting, the defendant drove off, and the three men discussed what they should do with the gun.  Huerta wiped the gun to remove fingerprints.  Ostendorf threw the magazine clip out the car window on a street near the Huey P. Long bridge then, while they were driving over the Huey P. Long Bridge, he threw the gun out of the car window into the Mississippi River.  The three went to the defendant's apartment on the Eastbank.  When he arrived home, he told Sabrina not to worry about the victim anymore because "it was taken care of."

That night, Detective Donald Meunier of the Jefferson Parish Sheriff's Office responded to a report of a shooting in the 500 block of Chalmette Street in Harvey.  When he arrived, Meunier found the victim, who was dead, in a blue Honda Accord with a single gunshot wound between the eyes.  On the ground outside the car, he found one casing from a .38 caliber bullet.

Although he did not find a weapon in the victim's car, Detective Meunier found a beeper and a cell phone.  When he accessed the phone records of the cell phone, he found the defendant's home telephone number and Huerta's telephone number.  During the investigation, Detective Meunier learned that the victim had "cut" three ounces of cocaine on the night of the murder, that the victim was known to carry guns, and that the defendant was threatened by the victim on the day of the murder.

Further investigation led to the issuance of arrest warrants for the defendant and Heurta.  After their arrests, the police took statements from the defendant and Huerta.  As a result of those statements, Ostendorf was also implicated.  Huerta was originally charged with principal to second degree murder but, in exchange for his testimony against the defendant, that charge was reduced to accessory after the fact.

Detective Meunier took four statements from the defendant on January 10, 2001.  At trial, the audiotapes of defendant's statements were played for the jury.  Sergeant Grey Thurman of the Jefferson Parish Sheriff's Office testified that, on January 10, 2000, he executed a search warrant for the defendant's residence.  During the search, he seized items including:  a cigar box with two portions

of rolling paper partially burned, scissors, plastic baggies, a pack of zig-zag rolling paper, multi-colored pipe, cell phone, pager, two portable scales, cigarette lighters, a razor blade, small plastic or glass tubing with a white residue on the interior and a "bong" or water pipe. Sgt. Thurman testified that, in his experience, the seized items were consistent with drug paraphernalia. On cross-examination, Thurman admitted that the items had not been tested or analyzed to determine the chemical content.

Dr. Susan Garcia, an expert in forensic pathology, testified that the victim died of a single gunshot wound to the head. Further, the stippling pattern of the wound indicated that the muzzle of the killer's gun was within three to eleven inches of the victim's head. Dr. Garcia also found Valium, cocaine, marijuana, dextromethorphan (cough medicine), chlorpheniramine (cold medicine) and caffeine in the victim's system.[17]

<u>Ineffective Assistance of Counsel</u>

Petitioner claims that his counsel was ineffective in failing to call Dr. William George as a toxicology expert. In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. <u>See</u> <u>id.</u> at 697.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. <u>See</u> <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions

---

[17] <u>State v. Cassard</u>, 811 So.2d 1071, 1073-76 (La. App. 5th Cir. 2001) (No. 01-KA-931); State Rec., Vol. I of VII.

in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ...

counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's

conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).

Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide

range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986);

Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

     In order to prove prejudice with respect to trial counsel, petitioner "must show that

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable

probability is "a probability sufficient to undermine confidence in the outcome." Id.  In making a

determination as to whether prejudice occurred, courts must review the record to determine "the

relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d

at 793.

     Petitioner bears the burden of proof when asserting an ineffective assistance of

counsel claim.  Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel

was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson,

227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that petitioner has made an insufficient showing

as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may

dispose of the claim without addressing the other prong.  Strickland, 466 U.S. at 697.

     A claim of ineffective assistance of counsel is a mixed question of law and fact.

Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Therefore, this Court must defer to the state

court on such claims unless the state court's decision "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United

States."  28 U.S.C. § 2254(d)(1).

The state district court rejected petitioner's ineffective assistance of counsel claim,

holding:

> The defendant alleges that defense counsel failed to assist his client and deprived him of a fair trial.  In particular, the defendant claims that the factors necessary for a conviction of manslaughter, i.e. "sudden passion" or "heat of blood" were proven in the instant case by a "preponderance of the evidence".  These factors were articulated by the State's witnesses regarding the threats and rage of the victim, Allen Cooper, towards the defendant.  The defendant claims that the only missing element to prove manslaughter was the toxicology and its effects upon Allen Cooper.  Defendant further explains that the testimony of the defense expert witness, Dr. William George, was necessary to prove the victim's aggressive and/or nervous state of mind.  The defendant explains that Dr. Susan Garcia did not testify to the psychological impact of the combination of three narcotics in the victim's system.  Defendant alleges that the testimony of Dr. George would have made a difference in the outcome of the trial, not guilty or manslaughter.
>
> In its response, the State argues that the defendant failed to establish either prong of the <u>Strickland</u> test, as failed to show that counsel's performance was deficient.  The State further contends that the decision to call or not to call certain defense witnesses is a matter of trial strategy and not necessarily evidence of a deficient performance.  Finally, the State contends that the defendant has failed to demonstrate that defense counsel's failure to present the testimony of Dr. George may have changed the outcome of the trial.
>
> The Supreme Court of the United States established the standards for the claim of ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  The test established by the Supreme Court provides that in order for a claim of ineffective assistance of counsel to prevail, the petitioner must show the counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and that the deficient performance prejudiced the

defense in that the errors were so serious as to deprive petitioner of a fair trial.

The Louisiana Supreme Court addressed this very issue in State v. Strahan, 325 So.2d 231 (La. 1975).

> "Further, failure of trial counsel to adequately question alibi witnesses, properly investigate the case, make an opening statement, have defendant take the stand, request particular special charges, and object to certain questions asked of witnesses at trial are all claimed to clearly show the defendant was not adequately and effectively represented at trial. We do not agree.  These charges are either leveled at decisions made by counsel during the heat of trial, the correctness of which cannot be determined by hindsight, or the validity of which is not evident from the record." Id. at 233.

The defendant's claims are essentially with his counsel's decisions regarding witnesses and motions filed during trial.  These claims are basically trial tactics based on the criteria established by the Supreme Court in Strahan.  According to Strahan, an attorney's decisions as to trial tactics do not rise to the level of ineffective assistance of counsel.  Thus, defendant's claim must fail because his counsel's action at trial was considered trial tactics according to Strahan and under the Strickland test, the defendant's claim must be dismissed for failure of defendant to meet the two-prong test.

Most importantly, the defendant has not proven that the testimony of Dr. George would have changed the outcome of the trial in this matter.  The trier of fact was presented evidence and testimony that the victim had three types of narcotics in his system, the victim made threats against the defendant, and carried a weapon just prior to the shooting.  The testimony of Dr. George would not have added anymore credence to the defense argument that the crime was committed with "sudden passion" or "heat of blood".  As the Fifth Circuit, Court of Appeals stated in its opinion:

> The defendant argues that the threats to his family incited sudden passion or heat of blood.  Le Blanc testified that the victim was a small guy and, although he bragged a lot, he never followed up on what he said.  Based on the evidence presented, in the light

most favorable to the prosecution, we find that a rational trier of fact could reasonably find that the defendant had the specific intent to kill the victim when he shot him in the head at close range.

Based on the foregoing evidence, we do not find that the verdict was contrary to the law and evidence, nor did the trial judge err in denying defendant's motion for new trial or post-verdict motion in arrest of judgment.

Cassard, 01-931 at pg. 11, 811 So.2d at 1078. ...
Thus, the defendant is not entitled to the relief sought.[18]

In denying petitioner's related writ application, the Louisiana Fifth Circuit Court of

Appeal likewise rejected petitioner's ineffective assistance of counsel claim, holding:

The fourth claim is ineffective assistance of counsel arising from trial counsel's failure to subpoena and/or obtain a toxicology expert, Dr. William George, to testify regarding the possible effects on the victim of narcotics in his system. Specifically, the defendant asserts that Dr. George's testimony regarding the psychological effects of the drugs in the victim's system would have demonstrated to the jury how "crazy" the victim was that night.

Relying on State v. Strahan, 325 So.2d 231 (La. 1975), the district court held that the defendant's claims relate to his counsel's decisions regarding witnesses and motions filed during trial and that an attorney's decisions as to trial tactics do not rise to the level of ineffective assistance of counsel. The district court also found that the defendant had not proven that Dr. George's testimony would have changed the outcome of the trial, because that testimony "would not have added any more credence to the defense argument that the crime was committed with 'sudden passion' or 'heat of blood.'"

We find no error in the district court's determination. Dr. George could not have testified how "crazy" the victim was that night; at best he could have only testified about the possible behaviors the victim could have exhibited after taking the drugs. Dr. Susan Garcia of the Jefferson Parish Coroner's Forensic Laboratory

---

[18] State Rec., Vol. II of VII, Order dated March 10, 2004.

testified that the drugs had already passed through the victim's system and were in his urine.  Defendant fails to establish how testimony from Dr. George on the possible effects of these drugs on the victim's behavior while they were in his system would be relevant to an understanding of the victim's state of mind at the time he was killed, since the drugs had already passed through his system and were in his urine.

Further, although the defendant refers to information from Dr. George as "new" evidence, in fact the information is a report found in his trial counsel's file labeled "Dr. George–Toxicologist."  Thus, trial counsel not only had Dr. George's report prior to trial, but also knew how he would testify, based on the information in the report and conversations with the doctor.  Nevertheless, trial counsel decided not to pursue placing his testimony into the record.

The witnesses who testified presented the jury with evidence of the victim's state of mind.  The witnesses testified about the actions, threats, habits and demeanor of the victim, including the threats earlier in the evening on the day of the shooting to kill the relator, his girlfriend and their baby.  There was even testimony of the rage that the victim exhibited at the time of the shooting.  Based on the lack of objections by trial counsel, he obviously made a strategic decision that the doctor's testimony would have explained the reason for the victim's behavior (*i.e.*, drug use), but was not crucial in proving the victim's state of mind.

On the appeal of the conviction, this Court pointed out that the defendant shot the victim at close range and under circumstances by which a rational trier of fact could reasonably find that the defendant had the specific intent to kill the victim when he shot him in the head at close range.  State v. Cassard, 01-931 at p. 8, 811 So.2d at 1078.

Considering the above, we conclude that any deficiency in the performance of the defendant's trial attorney regarding the testimony of Dr. George did not prejudice the defendant.  Even if Dr. George had testified based on the information in his report, the jury still could have reasonably found that the defendant had the specific intent to kill the victim when he shot him in the head at close range.  The relator has failed to prove any deficiency in his trial counsel's performance prejudiced him.

The court correctly found that the claim does not meet the two-prong test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (U.S. 1984).  Accordingly, the application is denied.[19]

The United States Fifth Circuit Court of Appeals has noted:  "Counsel is entitled to a presumption that his performance was adequate and complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy." Wilkerson v. Cain, 233 F.3d 886, 892-93 (5th Cir. 2000) (internal quotation marks omitted); see also Yohey v. Collins, 985 F.2d 222, 228 (5th Cir. 1993); Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981).  This Court finds that counsel's decision not to call Dr. George did not render petitioner's representation ineffective.  As the state court noted, Dr. George's testimony would have amounted to nothing more than an opinion as to what effect the drugs in the victim's system *might possibly have had* on his demeanor.  Even if counsel could have proven that there was some basis for that opinion, not necessarily as easy feat given that the evidence indicated that the drugs had passed from the victim's system into his urine, the opinion still, at best, would have been speculative.  Such speculative evidence was of minimal probative value, in that the prosecution had already introduced ample, better evidence, i.e. abundant *eyewitness* testimony of the victim's demeanor immediately prior to his murder.[20]  Under these facts, petitioner has fallen far short of his burden to establish a constitutional violation.

---

[19]  State v. Cassard, No. 04-KH-514 (La. App. 5th Cir. May 25, 2004) (unpublished); State Rec., Vol. II of VII.

[20]  See, e.g., State Rec., Vols. IV and V of VII, transcript of December 5, 2000, pp. 61, 64-66, 82-83, 203-06, and 222–24.

In the instant case, the state court correctly identified the appropriate legal standard, i.e. the <u>Strickland</u> standard.  Petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court rejects petitioner's claim that his counsel was ineffective.

<u>Admission of Prejudicial Evidence</u>

Petitioner's second claim is that the trial court erred in admitting at trial marijuana and drug paraphernalia which he argues was unduly prejudicial.  On direct appeal, the Louisiana Fifth Circuit Court of Appeal rejected that claim, holding:

> In his fourth assignment of error, the defendant contends that the trial court erred in admitting the drug paraphernalia seized during the search of his apartment because the sole use of the evidence was to portray the defendant as a "bad man."  The State responds that introduction of the drug paraphernalia was necessary to reveal the connection between the victim and the defendant and its theory that the killing was a result of a drug deal gone bad.  The State also sought to establish that this was not a case of a father protecting his child, as asserted by the defendant.
>
> All relevant evidence is admissible at trial. LSA-C.E. art. 402.  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  LSA-C.E. art. 401.
>
> Relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or waste of time.  LSA-C.E. art. 403.  The determination concerning relevancy of evidence is within the discretion of the trial judge whose rulings will not be disturbed in the absence of an abuse of discretion. <u>State v. Winfrey</u>, 97-427 (La.App. 5 Cir.10/28/97), 703 So.2d 63, 75, <u>writ denied</u>, 98-0264 (La. 6/19/98), 719 So.2d 481.
>
> On December 4, 2000, the court heard and denied the defendant's motion to suppress the seized evidence.  The record

reflects that the relationship between the defendant and the victim was predicated on the use and sale of drugs. It in uncontroverted that the defendant purchased drugs from the victim on several occasions in the past. Further, on the evening of the victim's murder, the defendant and Ostendorf dropped off a triple-beam scale, a piece of equipment commonly used to precisely measure drugs, at the defendant's apartment after selling some cocaine to a person to get the money needed to repay the victim. Here, the seized evidence demonstrated that the sale of drugs and money owed for drugs was the focal point of the encounter on January 6, 2000 between the defendant and the victim.

The defendant contends that the evidence in question consisted of marijuana and assorted marijuana paraphernalia. He claims that no evidence was presented that marijuana played a motive or role in the offense. At trial, it was not determined whether the drug paraphernalia pertained to cocaine or marijuana or both. Sergeant Grey Thurman, who seized the evidence from the defendant's apartment, only testified that the items were consistent with drug paraphernalia. We find the defendant's contention that the evidence was admitted solely to portray him as a "bad man" and drug abuser is without merit.[21]

The United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998). Therefore, to the extent that petitioner is arguing that the state courts merely misapplied state evidence law, his claim is not reviewable in this federal proceeding.

To the extent that petitioner is arguing that the introduction of the evidence violated his federal constitutional rights, he has failed to demonstrate that he is entitled to *habeas* relief on that basis. The United States Fifth Circuit Court of Appeals has noted:

---

[21] State v. Cassard, 811 So.2d 1071, 1078-79 (La. App. 5th Cir. 2001) (No. 01-KA-931); State Rec., Vol. I of VII.

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause.   The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); see also Little, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted.").   In the instant case, petitioner has not demonstrated that the evidence in question was erroneously admitted.   Moreover, even if the evidence had been inadmissible, it cannot be said to have played a crucial, critical, and highly significant role in petitioner's conviction.   In this case, prior to the introduction of the disputed evidence, there had been ample testimony that petitioner used drugs and was involved in the drug trade.[22]  Moreover, even petitioner testified at trial that he had in the past purchased marijuana and cocaine from the victim and was himself involved in the distribution of drugs.[23]   Accordingly, evidence that petitioner had marijuana and drug paraphernalia at his residence was hardly an unexpected or compelling fact.   Moreover, this Court has no reservation in finding that petitioner's conviction for second degree murder resulted not from the admission of the disputed drug-related evidence but rather from the uncontroverted fact that, after threats to his family, he shot the victim in the face at close range.   Petitioner has not met his burden to demonstrate that the admission of the disputed evidence resulted in a denial of fundamental fairness.

---

[22]   See, e.g., State Rec., Vols. IV and V of VII, transcript of December 5, 2000, pp. 24, 56, 95, 190, and 211-12.

[23]   See, e.g., State Rec., Vol. V of VII, transcript of December 6, 2000, p. 15.

Accordingly, petitioner has failed to demonstrate that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Applying the AEDPA's deferential standard, this Court rejects petitioner's claim.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the federal petition for *habeas corpus* relief filed by Douglas Cassard be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-seventh day of March, 2006.



SALLY SHUSHAN
UNITED STATES MAGISTRATE JUDGE